UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAWRENCE P. SCHNAPF <br> 55 East 87th Street, #8B <br> New York, New York 10128 <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL ARCHIVES AND RECORDS ADMINISTRATION <br> Washington, D.C. 20404 <br><br> Defendant. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * Civil Action No. 21-2816 (TJK) <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## FIRST AMENDED COMPLAINT

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, et seq., as amended, seeking both expedited processing and production of records responsive to a request submitted to the Defendant National Archives and Records Administration.

## JURISDICTION

1. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the defendant pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## VENUE

2. Venue is appropriate under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff Lawrence P. Schnapf ("LPS") is an attorney admitted to practice in New York and New Jersey with thirty-seven years of experience and has been an adjunct professor at New York Law School for twenty-five years.

4. Defendant National Archives and Records Administration ("NARA") is an agency within the meaning of 5 U.S.C. § 552(f) and in possession and/or control of the records requested by the Plaintiff that are the subject of this action.

## FACTUAL BACKGROUND

5. This FOIA lawsuit seeks a more comprehensive and complete production of the historical record of coordination between the Archivist of the United States ("Archivist") and former President Donald Trump ("President Trump") and current President Joseph Biden ("President Biden") during each man's tenure as the leader of the Executive Branch of the U.S. government.

6. On November 22, 1963, as President John F. Kennedy's motorcade traveled through Dealey Plaza in downtown Dallas, Texas, he was shot and suffered a fatal head wound. Doctors at Parkland Memorial Hospital in Dallas pronounced President Kennedy dead shortly thereafter. Dallas police officers arrested and charged Lee Harvey Oswald with assassinating President Kennedy.

7. On November 24, 1963, Oswald was shot and killed by Jack Ruby during the Dallas Police Department's transfer of Oswald from the city jail to the county jail. Jack Ruby was tried and convicted of Oswald's murder in March 1964. In October 1966, the Texas Court of Criminal Appeals reversed the verdict and ordered a new trial. Ruby died of cancer three months later before his new trial began. Ruby maintained he was neither involved in the assassination of President Kennedy nor knew Oswald prior to hearing his name in connection with the assassination.

8. One week after the assassination, President Lyndon B. Johnson established the President's Commission to Investigate the Assassination of President Kennedy. It was

chaired by Earl Warren, Chief Justice of the U.S. Supreme Court and became known as the "Warren Commission". The Warren Commission had no independent team of investigators but relied on the work of the Federal Bureau of Investigation ("FBI"), the Dallas Police Department and the Secret Service. In September 1964, the Warren Commission issued a final Report that concluded Lee Harvey Oswald acted alone and shot President Kennedy from a sniper's nest on the sixth floor of his workplace, the Texas School Book Depository. The Warren Commission conducted some of its investigations in secret and sealed many of its records for seventy-five years. These facts resulted in public skepticism about the Warren Commission's conclusion.

9. Subsequently, other federal entities conducted additional investigations of the assassination. In November 1975, the House of Representatives' Subcommittee of the Committee on Government Operations held a hearing titled "National Archives-Security Classification Problems Involving Warren Commission Files and Other Records". Among the findings, the Committee concluded that "[T]he Warren Commission was never specifically given the power by the President under the Executive order to originally classify its transcripts and memos. In effect, then, hundreds of Warren Commission documents were withheld from the public for years when there was no sound or legal basis for it."

10. Between October 1975, and September 1976, the House of Representatives' Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary held a series of FBI oversight hearings which included an examination of certain activities of the FBI during its investigation of the assassination of President Kennedy.

11. The most significant of these later investigations was the House Select Committee on Assassinations ("HSCA"), which concluded in 1979 that President Kennedy's death was the result of a probable conspiracy. Many of the investigative files of the entities that had each investigated aspects of the assassination, such as the Warren Commission, the HSCA and other Congressional investigations such as led by Congressman Otis Pike, Senator Frank Church and Vice President Nelson Rockefeller, were withheld from the public. Yet members of these entities reached specific conclusions, sometimes inconsistent with one another, based on their investigative records. According to the Assassination Records Review Board ("ARRB"), which was created by Congress in 1992, the American public lost faith when it could not see the very documents whose contents led to these conclusions.

12. Using FOIA, researchers requested access to records compiled by the FBI as part of its investigation into the assassination, and thousands of pages of additional records were released during the 1970s and 1980s. However, scores of documents were discovered to have been destroyed and many the documents received by researchers under FOIA were heavily redacted. In addition, the records of certain investigative bodies, which had each investigated aspects of the assassination, remained closed to the public because they were outside FOIA's reach. As mentioned previously, the Warren Commission initially sealed its records for seventy-five years (until 2039), while the HSCA originally sealed its records for fifty years (or until 2029).

13. On October 26, 1992, President George W. Bush signed into law the President John F. Kennedy Assassination Records Collection Act of 1992 (44 USC § 2107 note) ("JFK Act"), which created the ARRB. The Board oversaw the review of several million

4

documents deemed to be "assassination records" under specific standards set forth by Congress with the intention of providing as much public disclosure as possible.

14. The JFK Act is a unique statute. It states that all records concerning the assassination "should carry a presumption of immediate disclosure"; that "only in the rarest cases is there any legitimate need for continued protection of such records", and that it was necessary because "the Freedom of Information Act, as implemented by the executive branch, had prevented the timely public disclosure of records relating to the assassination of President John F. Kennedy."

15. To achieve this goal, the JFK Act created the JFK Collection and the ARRB. The JFK Collection, under the supervision of NARA, serves as a central repository for all records of the assassination of President Kennedy. The ARRB was an independent agency composed of five members and their staff with the responsibility of overseeing agency searches for assassination records. Among its other powers, the ARRB had the final authority (subject to the President of the United States) to approve or reject agency proposals for withholding information. It was this power that the architects of the JFK Act hoped would result in more information being released than had been under FOIA.

16. One of the first tasks the ARRB set for itself was further defining what constitutes an assassination record. The JFK Act had defined an assassination record as a record "related to the assassination of President John F. Kennedy, that was created or made available for use by, obtained by, or otherwise came into possession of" an extensive list of Legislative, Executive, State, and local government entities. These included the records of all previous investigations (including the Warren Commission and the HSCA), the National Archives, and any agency in the Executive Branch.

5

17. Under regulations adopted by the ARRB in 1995, an assassination record "includes, but is not limited to, all records, public and private, regardless of how labeled or identified, that document, describe, report on, analyze, or interpret activities, persons, or events as reasonably related to the assassination of President John F. Kennedy and investigations or inquiries into the assassination."

18. After promulgating its definition of an assassination record, the ARRB began its most important work, reviewing the information agencies wanted to postpone rather than release. In their early meetings in 1995, ARRB board members looked at each document proposed for postponement, either in full or in part, along with the agency justification for postponement. The board members then voted on each document—whether to accept the agency's proposed decision or request more information. Eventually, the ARRB delegated some routine decision making to its staff. The ARRB finished its work on September 30, 1998, when it issued a final report, and then transferred all of its records to NARA. Because of the ARRB's work, the JFK Collection is not only important for researchers of the assassination, but also serves as a valuable source for researchers interested in various aspects of early 1960s Cold War America.

19. Section 5(g)(2)(B) of the JFK Act mandates that all assassination records be publicly disclosed no later than October 26, 2017, unless the President certified that (i) continued postponement is made necessary by an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations; and (ii) the identifiable harm is of such gravity that it outweighs the public interest in disclosure.

20. On October 26, 2017, based on objections from federal agencies, President Trump issued a temporary certification to withhold certain information based on the claim that public release would harm national security, law enforcement, or foreign affairs. President Trump relied upon a Department of Justice's Office of Legal Counsel memorandum ("OLC Memo") that directed agencies to re-review each of their redactions over the following 180 days. The OLC Memo referred to an October 12, 2017, memorandum from the Archivist of the United States ("Archivist") that expressed "significant concerns" about the manner in which certain federal agencies had applied that standard in their proposals for postponing the release of some of their records beyond that deadline. This memo and the underlying agency requests constitute assassination records as defined by the JFK Act.

21. The OLC Memo also referenced a "Memorandum for John A. Eisenberg, Legal Adviser to the National Security Council, from John P. Fitzpatrick, Senior Director for Records, Access and Information Security Management, National Security Council, Re: Department and Agency Requests for Continued Postponement of Records under the JFK Assassination Records Collection Act" (Oct. 25, 2017)("NSC Memorandum"). The NSC Memorandum constitutes an assassination record as defined by the JFK Act.

22. As part of the review process, agency heads were directed to be extremely circumspect in recommending any further postponement of information in the records. Agency heads were required to report to the Archivist by March 12, 2018, any specific information within each particular record that met the standard for continued postponement under the JFK Act. The Archivist then recommended to the President of

the United States on March 26, 2018, whether this information warranted continued withholding after April 26, 2018.

23. On March 26, 2018, the Archivist reported that as of March 12, 2018, the following agencies requested continued postponement of particular records: Central Intelligence Agency, Department of Defense, Department of Justice, FBI, Drug Enforcement Agency, and the Department of State. These agency requests have not been disclosed to the public. These documents constitute assassination records as defined by the JFK Act.

24. On April 26, 2018, NARA issued a press release that stated further partial releases were authorized by the President, and that all information that remained withheld under section 5 must be reviewed again before October 26, 2021, in order to determine whether continued withholding from disclosure remains necessary.

25. In a January 21, 2020, response to a FOIA request filed by Government Attic, NARA identified the existence of letters dated October 4, 2017, and October 12, 2017, from the Archivist to the President concerning the JFK Act. These documents constitute assassination records as defined by the JFK Act.

26. On October 22, 2021, President Biden certified that all information within records that agencies have proposed for continued postponement under section 5(g)(2)(D) of the JFK Act shall be withheld from full public disclosure until December 15, 2022. It was noted that temporary continued postponement is "necessary to protect against identifiable harm to the military defense, intelligence operations, law enforcement, or the conduct of foreign relations that is of such gravity that it outweighs the public interest in immediate disclosure."

27. The need for transparency requires providing the public with fuller disclosure of the underlying requests from federal agencies, as well as the recommendations of the Archivist, to better understand why assassination records subject to the JFK Act have been withheld from public disclosure.

## COUNT ONE (EXPEDITED PROCESSING)

28. Plaintiff repeats and realleges paragraphs 5-27 above, inclusive.

29. On May 14, 2021, Plaintiff submitted to NARA a FOIA request for the following copies of non-exempt records:

 a) Submissions from the agencies referred to in the March 2018, Archivist letter;

 b) The specific harms identified by the relevant agency;

 c) The explanation on how any such identifiable harm outweighed the public interest in disclosure;

 d) Copies of any identification aids prepared by any agency or department supporting continued postponement pursuant to JFK Act Section 5(c)(2)(D)(ii);

 e) All other correspondence, email, communications, memoranda or other writings from the agencies or departments to the Archivist requesting or proposing postponement of assassination records during 2017 and 2018;

 f) All correspondence, memoranda or other writings of the Archivist evaluating the proposals or requests for postponement of such assassination records; and

 g) All correspondence, memoranda or other writings between the Archivist and the Office of the Executive of the United States relating to the recommendation to postpone disclosure of assassination records during 2017

9

and 2018 concerning the objections of agencies to the public release of records under the JFK Act scheduled for October 26, 2021.

30. NARA assigned the request NGC-2021-000923.

31. NARA was required to issue a determination on the request for expedited processing "within 10 days after the date of the request." 5 U.S.C. § 552(a)(6)(E)(ii)(I). Thus, a response was due no later than May 24, 2021.

32.  On May 20, 2021, NARA denied the Plaintiff's request for expedited processing on the grounds that he had not provided "sufficient information to establish he meets one of the criteria required under the National Archives and Records Administration (NARA) regulation 36 C.F.R. 1250.28 (a) and (c) to justify expedited processing."

33. There is no requirement for exhaustion of administrative remedies with respect to challenging a denial of expedited processing.

## COUNT TWO (COMPEL PRODUCTION)

34. Plaintiff repeats and realleges paragraphs 5-27 above, inclusive.

35. On May 14, 2021, Plaintiff submitted to NARA a FOIA request for the following copies of non-exempt records:

   a) Submissions from the agencies referred to in the March 2018, Archivist letter;

   b) The specific harms identified by the relevant agency;

   c) The explanation on how any such identifiable harm outweighed the public interest in disclosure;

   d) Copies of any identification aids prepared by any agency or department supporting continued postponement pursuant to JFK Act Section 5(c)(2)(D)(ii);

10

e) All other correspondence, email, communications, memoranda or other writings from the agencies or departments to the Archivist requesting or proposing postponement of assassination records during 2017 and 2018;

f) All correspondence, memoranda or other writings of the Archivist evaluating the proposals or requests for postponement of such assassination records; and

g) All correspondence, memoranda or other writings between the Archivist and the Office of the Executive of the United States relating to the recommendation to postpone disclosure of assassination records during 2017 and 2018 concerning the objections of agencies to the public release of records under the JFK Act scheduled for October 26, 2021.

36. NARA assigned the request NGC-2021-000923.

37. To date, no substantive response has been received. The Plaintiff has therefore constructively exhausted all required administrative remedies.

WHEREFORE, Plaintiff prays that this Court:

(1) Order NARA to grant expedited processing to the Plaintiff;

(2) Order NARA to release copies of all non-exempt responsive records to the Plaintiff;

(3) Award reasonable costs and attorney's fees as provided in 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412(d);

(4) Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

(5) Grant such other relief as the Court may deem just and proper.

Date:   January 14, 2022

        Respectfully submitted,

        /s/ Bradley P. Moss
        _____
        Mark S. Zaid, Esq.
        D.C. Bar #440532
        Bradley P. Moss, Esq.
        D.C. Bar #975905
        Mark S. Zaid, P.C.
        1250 Connecticut Avenue, N.W.
        Suite 700
        Washington, D.C. 20036
        (202) 454-2809
        (202) 330-5610 fax
        Mark@MarkZaid.com
        Brad@MarkZaid.com

        Attorneys for Plaintiff